The State National Bank of Texarkana v. Commissioner.
State Nat'l Bank of Texarkana v. Commissioner
Docket No. 25581.
United States Tax Court
1950 Tax Ct. Memo LEXIS 228; 9 T.C.M. (CCH) 293; T.C.M. (RIA) 50091; April 6, 1950
*228 In the taxable year 1945, petitioner contributed $1,000 to the FourStates Fair, Inc. of Texarkana, Texas-Arkansas. The Fair was organized under the laws of the State of Texas as a voluntary, nonprofit association and had no capital stock. In the taxable year the association was operated exclusively for scientific and educational purposes. No part of its net earnings inured to the benefit of any private shareholder or individual and no part of its activities was devoted to the carrying on of propaganda or otherwise to influence legislation. Held, petitioner's contribution of $1,000 to the Fair is deductible under section 23(q)(2) of the Internal Revenue Code. Leonard L. Scott, Esq., for the petitioner. John P. Higgins, Esq., for the respondent. BLACK *229 Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income tax for the year 1945 of $368.68. The deficiency is due to adjustments which the Commissioner made to the net income as disclosed by petitioner's return. These adjustments are shown in the deficiency notice as follows: Net income as disclosed by return
$97,514.04
Unallowable deduction and additional income: (a) Net loss on property other than capital assets
$ 491.21
(b) Deduction for advertising denied
1,000.00
1,491.21
Total
$99,005.25
Additional deduction: (c) Allowance for depreciation
262.50
Net income adjusted
$98,742.75 Adjustment (b) contained in the deficiency notice is explained therein as follows: "(b) It has been determined that the $1,000.00 claimed as advertising expense in your return which represented a payment to the Four-States Fair Association was not allowable as a contribution under section 23-(q) of the Internal Revenue Code, or an ordinary necessary business expense within the contemplation of section 23 (a) of the Internal Revenue Code. Consequently, the $1,000.00 deduction in question *230 has been denied." The petitioner contests only adjustment (b) shown in the deficiency notice. As to that adjustment, petitioner assigns error as follows: "(a) The Commissioner erred in determining that $1,000.00 paid by Petitioner in 1945 to Four States Fair, Inc. was not allowable as a contribution under Section 23 (q) (2) of the Internal Revenue Code. "(b) Alternatively, the Commissioner erred in determining that $1,000.00 paid by Petitioner in 1945 to Four States Fair, Inc. was not deductible as a business expense under Section 23 (a) (1) (A)." Findings of Fact The petitioner is a banking corporation organized and existing under the laws of the State of Arkansas with its principal office in Texarkana, Arkansas. Its income tax return for the year 1945 was filed on the cash basis with the Collector for the District of Arkansas. Texarkana, Arkansas-Texas, is one city, although, legally, two separate municipalities, being located, respectively, in Miller County, Arkansas and Bowie County, Texas. The Four States Fair was organized under the laws of the State of Texas on August 14, 1945, for a term of 50 years and has no capital stock, there being contributors *231 only. It will sometimes hereafter be referred to as the Fair. Article II of the charter reads, as follows: "This corporation is organized and shall be operated for the scientific and educational encouragement of agriculture, horticulture, livestock, poultry and farm products by the maintenance of public fairs and exhibitions and to promote generally the welfare of agriculture, horticulture, livestock, poultry and farm products in the State and Nation." Article VI of the charter reads: "This corporation is not organized for profit and has no capital stock and owns no property at the present time, but it anticipates that it will receive contributions in the future of money, property and labor." The bylaws of the corporation provide that a contributor of $25 or more is a member for the fiscal year only in which such contribution is made and is entitled to one vote only, regardless of the amount contributed. The first Fair was held in 1945, and has been held annually since then. They have been conducted in substantially the same manner each year. Annually, before the Fair is held, its officers and directors confer with the home demonstration agents and county agents for the purpose *232 of formulating plans for displays. The county agents formulate the plans for the endeavors for which they are particularly equipped or interested. Many things which affect farm home life are displayed - canned goods, raising cattle, poultry and food products, and making garments at home. Primarily, there are exhibits of livestock, agricultural products, 4-H displays, F.F.A. displays, garden club displays and things of that sort. There are livestock exhibits of both beef and dairy cattle of different ages, types and breeds. The agricultural exhibits include exhibits of numerous small communities around Texarkana and display various kinds of potatoes, grain sorghums and cotton. There are 4-H displays on home economics, as well as cattle. Attendants are at the home economics exhibits, including county agents and sometimes those trained by county agents, who explain the exhibits. Included also is a fine arts exhibit embracing hooked rugs, portraits, water colors, and paintings and photography. There is a well arranged and well kept negro division exhibit, including dressmaking, canning and home economics. Also included is a foresty exhibit fostered by the state officials of Arkansas *233 and Texas. This exhibit is devoted to the preservation of timber by preventing forest fires and doing away with diseases and insects that destroy forests. Pamphlets explaining the exhibit are on hand for distribution to those who desire them. Furthermore, there are Boy and Girl Scout exhibits and Red Cross exhibits. The Fair was organized more to enlist the interest of young people than old people. Texarkana is a livestock and agricultural region and it was felt that the best results could be accomplished by working with younger people. Prior to the Fair, regular published catalogues, including the list of premiums and prizes offered, are sent to farmers and stock raisers in the four-states area - Oklahoma, Texas, Louisiana and Arkansas. Over 2,000 catalogues are sent out and approximately 1,500 premiums are awarded for all the various exhibits. To judge cattle, experts are obtained from Texas A. & M., Louisiana State University and the University of Arkansas. The livestock judges point out the merits of one head of cattle over another and on occasion the owner will tell how the winning cattle was raised or fed. Money prizes and ribbons are offered to the winning exhibitor. The *234 primary purpose of the premiums is as an incentive to induce the raising of finer cattle, although it helps defray the expense of the exhibits. One means used to encourage young folks in raising cattle is to select a group of young boys from a 4-H or F.F.A. Club; 12 boys are put in a ring with 8 calves; each boy who catches a calf gets to keep it but he must feed and groom the calf and bring it back the next year. This is called the "calf scramble." About 26 or 30 county agents representing about 12 or 13 adjoining counties work with the officers of the Fair. These county agents and vocational teachers participate in planning for the Fair throughout the year. They take young folks and train them throughout the year in the raising of agricultural products and the things that pertain to farm life. At the end of the year some of these young people bring to the Fair for display the results of their training during the year. The general admission to get into the fairgrounds in 1945 was 50 cents for adults and 25 cents for children. No charge is made for the inspection of the exhibits after one gets into the fairgrounds. During the Fair, in 1945, a carnival and rodeo were operated *235 on the fairgrounds, the carnival having all sorts of rides for children, such as a merry-go-round, ferris wheel, and the like. The carnival is not owned by the Fair but is operated as a concession by other owners. The rodeo is operated by a rodeo man who shares 50-50 with the Fair over and above the guarantee of his expenses. The purpose of the rodeo and the carnival is to attract visitors to the Fair and help pay the expenses of the Fair. The officers of the Fair felt that an educational program would be more successful when it appealed to many people. Booths are leased to merchants for commercial exhibits in order to help defray the expenses of the Fair. The income of the Fair is derived from contributions, general admission, concessions, merchants' booths, the carnival and the rodeo. The total gross receipts, together with the five largest items of receipts of the Four States Fair for the years 1945 to 1948, inclusive, are shown below: 1945
1946
1947
1948
Total Gross Receipts (before reduction for admission
taxes or any contractual expenses)
$37,725.93
$74,683.31
$60,746.08
$59,846.47
Fime largest items of receipts: Main Gate Admissions
14,263.30
14,822.60
16,880.39
16,695.10
Calf Scramble and Auction
1,800.00
27,704.19
12,510.25
7,897.67
Rodeo Gate Receipts
12,435.49
18,481.71
17,296.10
17,567.23
Carnival Receipts
3,907.09
7,056.18
5,837.80
5,286.72
Concessions and Booths
2,994.00
5,233.75
6,659.48
3,834.87
*236 The total disbursements, together with the three largest items of disbursements of Four States Fair for the years 1945 to 1948, inclusive, are shown below: 1945
1946
1947
1948
Total Disbursements
$37,289.56
$69,678.67
$62,835.20
$55,477.08
Three largest items of disbursements: Cost of Rodeo
7,716.12
14,208.44
13,148.74
14,357.62
Cost of Calf Scramble and Auction
1,660.89
28,070.99
13,136.03
8,372.23
Premiums (Cattle & Other)
5,743.95
7,759.73
8,995.08
9,089.60 Also in 1943 there were donations to a permanent Fair fund of $35,133.93. The net income (or loss) of the Four States Fair for the years 1945 to 1948, inclusive, is shown below: 1945
1946
1947
1948
Net Income (or loss)
$558.73
$5,004.64
($2,089.12)
$4,369.39
The cost of permanent improvements of the Four States Fair for the years 1945 to 1948, inclusive, are shown below: 1945
$ 8,000.00
1946
18,551.47
1947
25,231.64
1948
4,285.35 The total investment in permanent improvements of the Four States Fair, Inc., on December 31, 1948, was $56,068.46. Donations received have been: Year
Donations
1945
$35,133.93
1946
2,680.00
1947
825.00
1948
2,175.00
*237 All the money that has been made and all the cash contributions received have been used for permanent fairground improvements and for no other purpose. The Fair is located in Spring Lake Park which is about one and one-half miles beyond the city limits of Texarkana. The Four States Fair was, in the year 1945, a corporation, organized and operated exclusively for scientific and educational purposes. No part of its net earnings inured to the benefit of any private shareholder or individual and no part of its activities was devoted to the carrying on of propaganda or otherwise to influence legislation. Opinion BLACK, Judge: The questions presented by the assignments of error are: (1) Was $1,000.00 paid by Petitioner in 1945 to Four States Fair Inc. allowable as a contribution under Section 23 (q) (2)of the Internal Revenue Code? (2) Alternatively, was the $1,000.00 paid by Petitioner in 1945 to Four States Fair, Inc. deductible as a business expense under Section 23 (a) (1) (A) of the Internal Revenue Code? We will first take up (1) above. The applicable statute is section 23 (q) (2). [1]
*238 The charter of the Fair to which petitioner made a contribution of $1,000 in 1945 provides: "This corporation is organized and shall be operated for the scientific and educational encouragement of agriculture, horticultural, livestock, poultry and farm products by the maintenance of public fairs and exhibitions and to promote generally the welfare of agriculture, horticulture, livestock, poultry and farm products in the State and Nation." From the facts set out in our findings above, which we deem it unnecessary to repeat, we think petitioner has proved that in the taxable year the Fair was operated in accordance with the provisions contained in its charter. It is true that the Fair, in order to attract a larger number of visitors than would otherwise attend and to supplement its revenues for the carrying out of its main and principal purposes, leased to concessionaries the right to operate a carnival and a rodeo. The Fair received from these concessions a substantial percentage of the receipts and the total amount received was considerable. These things, we think, were merely incidental to the operation of the Fair and the carrying out of the principal purposes for which it *239 was organized and operated and did not destroy the tax exempt character of the corporation. See James A. Connelly, 6 T.C. 744 and Southeastern Fair Assn. v. United States, 52 Fed. Supp. 219. In the latter case the court made certain special findings of fact, among which was the following: "15. The fair, which is open from 9 a.m. to midnight, is operated on a tract of land called Lakewood Park. There is a general admission charge of 50 cents, but no charge is made for any of the exhibits. In order to attract visitors to the fair, there is a grandstand on the property at which free shows, including vaudeville acts, fireworks, lectures, and, in some years, automobile races, are held daily. Speakers of national prominence are obtained to formally open the fair, and their speeches are broadcast over the radio. "Plaintiff does not operate an amusement section, but in order to obtain funds for payment of prizes and other expenses, it leases a part of the grounds to a carnival company and other concessionaires. This section, known as the Midway, also includes a roller coaster, Ferris wheel, merry-go-round, and other forms of amusement. "Plaintiff leases space *240 in one of its buildings for commercial exhibits at prices ranging from $50 to $125, in accordance with the amount of space occupied. During a typical year about 50 business concerns lease space for exhibits in order to show and sell their merchandse and equipment." An examination of special finding of fact No. 15 above as made by the Court of Claims shows that the concessions there involved operated at the fair, were very similar in character to those which were operated in the taxable year at the Four States Fair. The Court of Claims held that notwithstanding these amusement concessions were operated at the Southeastern Fair Association and the association received a part of the receipts therefrom, those facts did not destroy the exempt character of the Fair Association. The Court of Claims said in that connection: "Plaintiff's purpose in furnishing free noneducational amusement at the grandstand is to get people to come to the fair, pay the 50-cent admission charge, and see the educational exhibits. Its purpose in renting concessions to commercial entertainers, and space to commercial exhibitors, is to get money to operate the fair, as well as, again, to attract attendance. *241 "Whether an enterprise is exclusively educational, or religious, or charitable, for tax exmptions purposes, depends, not upon how it makes its money, but upon the purpose for which it makes it, that is, how it spends what it makes. Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S. Ct. 204, 68 L. Ed. 458; Sand Springs Home v. Commissioner, 6 B.T.A. 198. This is necessarily so, unless the exemption is to be denied to all entities not adequately endowed with funds which other persons have made by engaging in some enterprises for profit. We think that the evidence shows no other purpose, directly connected with the conduct of the fair, than an educational one. It may well be that those who contributed capital to plaintiff may have expected to make money out of the patronage of those who came to Atlanta to attend the fair, or to share in the greater prosperity which might come to the region if its agriculture should be made more productive as a result of the education which those who attended the fair might gain. These are motives which sometimes actuate donors to colleges and universities, but these institutions do not lose their tax exemption thereby." We, likewise, *242 hold that the operation of the carnival and the rodeo at the Four States Fair in 1945 and the sharing in the receipts of these concessions, and other concessions of lesser importance by the Fair did not destroy the exempt character of the Fair and did not impair petitioner's right to deduct its contribution of $1,000 to the Fair under the provisions of section 23 (q) (2) of the Internal Revenue Code. Respondent does not contend that any part of the activities of the Fair was the carrying on of propaganda or otherwise attempting to influence legislation. The evidence affirmatively establishes that the Fair carried on no such propaganda and was in no way or manner attempting to influence legislation. Respondent does not contend that thus far any private shareholder, or individual has received any of the net earnings of the Fair but he does contend that upon the final liquidation and dissolution of the Fair some individuals or shareholders might receive its permanent property or the proceeds thereof. We do not think, however, when we consider the kind of an organization which the Four States Fair is, coupled with the other facts in evidence, that we would be justified *243 in making such an inference. Cf. Crooks v. Kansas City Hay Dealers' Association, 37 Fed. (2d) 83. From all the evidence in the record we have found that the Four States Fair was a voluntary, nonprofit association organized under the laws of the State of Texas and that no part of its net earnings inures to the benefit of any private shareholder or individual. For the reasons stated above we hold that petitioner is entitled to deduct the $1,000 contribution here involved under the provisions of section 23 (q) (2) of the Internal Revenue Code. James A. Connelly, supra; Southeastern Fair Assn. v. United States, supra. Petitioner's assignment of error (b) is only urged in the alternative. Since we have sustained petitioner's assignment of error (a), it becomes unnecessary to decide the issue raised by assignment of error (b). Inasmuch as the other adjustments made by the Commissioner in his deficiency notice are not contested, Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(q) Charitable and Other Contributions by Corporations. - In the case of a corporation, contributions or gifts payment of which is made within the taxable year to or for the use of: * * *
(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States, or of any State or Territory, or of the District of Columbia, or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, veteran rehabilitation service, literary, or educational purposes or for the prevention of cruelty to children (but in the case of contributions or gifts to a trust, chest, fund, or foundation, payment of which is made within a taxable year beginning after December 31, 1948, only if such contributions or gifts are to be used within the United States or any of its possessions exclusively for such purposes), no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; * * *↩